It's just about the fastest arrival at podium I've ever seen, which is good, which is good. All right. May it please the court, my name is Dylan Russell with Hoover Slovichek. I represent the appellants Adam and Olstowski. This court should reverse and render judgment on liability for misappropriation of theft, misappropriation and theft of trade secrets, and then remand for a trial on monetary relief for both damages and attorney's fees. On the issue of liability, I would like to ... Reverse, render, and remand. Yes. Render on liability, and then reverse, I'm sorry, reverse and render, and then remand the liability question, I'm sorry, the damages and attorney's fees question to the district court since that obviously was not reached. On the issue of liability, I'd like to make five points. The first three are pretty quick, and that is that the appellant's trade secret is the technology and methods embodied in the patent application, and that's the key, the patent application, styled eczema UV fluorescence detection. The patent application itself says that the, quote, invention more specifically is a system and method of detecting sulfur dioxide using, and this is the key, a krypton chloride dielectric barrier discharge eczema lamp. That's what made this unique for purposes of ultimately getting a patent, and the third point is what's key here is that this is a trade secret. This is not a patent dispute. I think the district court reached the conclusion it did on liability in part because it treated it like a patent dispute as opposed to a trade secret dispute, and fourth, they admit that their technology contains the trade secret as defined in the patent application, and that patent application, of course, the district court reaffirmed what the arbitration award in 2007 decided, what the trial court to the 269th district court in Harris County concluded was the trade secret as well as the court of appeals, the first court of appeals in late 2010. They all agreed that the trade secret is... What witness actually compared the two lamps? There's four places in the record where they admit some of it was through testimony. You have to put some of the pieces together through some of the exhibits, the testimony from depositions as well as some of the exhibits, and then some of the trial testimony to... The trial testimony that I saw was these people that had worked it at him saying, yeah, I thought it was, you know, Olszewski, I don't know how to pronounce it. I thought it was this guy's work. Well, why didn't he testify, hey, I compared the two, and this is where they're similar? Because we didn't need to, because all the evidence was already admitted into the record, and I'm going to tell the court, those precise pages, the pages in the record where the court can find what comprises their admission of using the technology as broadly defined in the patent application includes page 3884, and I'm going to talk about that one in more detail in just a second, but 3884 is the comparison document that they were court ordered to prepare to the district court to describe the differences and similarities between the two eczema lamps, which is really the technology we're talking about, as well as the Schmitt's deposition, which was 1822 in the record, and the Rick deposition excerpts, which was 2009 in the record, and you also can look at their own witness, Lisa Houston, during the trial, 2913 to 14, and 2917 to 18, and those pages, she admits that she learned the krypton chloride was the gas mixture in the lamp because Mr. Olszewski told her about it. You can also find, and that's why I referenced this term that's in the patent application, the dielectric barrier discharge eczema lamp. That's a specific kind of eczema lamp that has certain components that function a particular way, and their patent application, PACS patent application, pages 3700 to 3701, as well as 3703, all describe the exact components that make up our eczema lamp and why they are the same when you look at what the definition of our technology is as a trade secret. So if the court looks at . . . If the court tries to make this a question of law and understand why, because that's a good appellate strategy since the standard review is different, this seems highly fact-bound, which you just said, and highly fact-bound stuff is typically for the fact finder, which here is Judge Hughes. And I think the reason why this is a legal question for the court is because of the unique way this case got ultimately to the district court and now this court, which is the question of whether there's a trade secret and what the trade secret is has been decided as the law of the case in December of 2010 when the mandate from the first . . . You're not claiming they're identical. And so since they're not identical, the question is, are they different enough that this is not . . . Because all automobile, or most automobiles, I guess there's electric ones now, use gas. So if I say, well, I invented a car that used gas, that doesn't suddenly make it a trade secret. So you have to kind of discern, are we just talking about, you know, using oxygen, which is in the air, or are we talking about something unique? And that's very fact-bound. Here's why the court can make this clearly a legal de novo question. First of all, we don't dispute the differences. The three differences that the district court outlined, we can see they're conclusively proved. Those differences being the difference with the inner electrode. Theirs is a spiral coil of polished aluminum. Ours is a solid metallic rod. Second, they say we never told them what the chloride gas. And then the issue of the emission aperture, they call it a light output window. Whether it's the same thing . . . Back to your . . . Sure. You were saying, we don't dispute these things . . . Right. . . . when you listen to those things. But you were telling us something bigger. Yes. What I'm going to tell you is that the reason this is a de novo legal question for the court is, we don't concede those three differences. We concede those three differences, but . . . So this is, to me, analogous to an insurance coverage eight quarters analysis, where the court takes the underlying plaintiff's pleadings, allegations as true, for purposes of then construing the four corners of the policy to determine whether there's coverage. This is . . . Why? This is the same question. The same question is because the facts are undisputed. The facts are, here's the differences. The question is, looking, construing the four corners of the arbitration award, the confirmation order, and the patent application, does do those differences take you outside of the four corners? Krypton chloride isn't enough. No, it isn't. It's like my analogy of the, you know, I invented a new car, and in my statement of trade secret, it says this car uses gasoline. That doesn't all of a sudden mean that every car that uses gasoline, but that my colleague's car that now uses gasoline is violating the trade secret. It is violating the trade secret because what was defined as the trade secret is set in stone based upon what the patent application says, and the language here that the district court also confirmed, this is what the arbitrators decided, that it is the technology and methods embodied in the patent application, not just the patent claims, but the entire patent application describes what it is. The combustion engine, and so it would apply to all cars. I can draw the lines for the court to give some examples. Absolutely. If you look at pages the 29, 13 to 14 of the trial testimony, for example, they asked Lisa Houston, tell us other examples of gas mixtures that can be included in an exomer lamp that makes UV fluorescence to detect sulfur, and she gave two other examples of two gases that were not krypton chloride, and it was, so for example, if they had said, well, our lamp is not a krypton chloride exomer gas lamp, it is an argon and some other gas. So any krypton chloride lamp is within the four corners. Is that your position? My position is the 34, page 3458 of the record, which is a statement of description of the invention in the patent application, describes what they cannot use and what is our trade secret, and again... They cannot use any of those things. They cannot use... Other combinations or with other things. Here's what they cannot use. A system, a method for detecting sulfur dioxide using a krypton chloride dielectric barrier discharge exomer lamp. So anyone that uses that... Not anyone, just PAC, because the whole reason this is a trade secret case and not a patent infringement case is because there was a contract between the parties in the early 2000s that said, hey, I'm going to share you this idea that no one else has thought of, and before I share you the details that I just described to this court from those pages, until I share you those specific details of the dielectric barrier discharge exomer lamp that contains krypton chloride, until I... So it doesn't matter that the description can be found in other sources because they have a trade secret agreement. It seems to me that Judge Hughes is kind of going to say why this wouldn't be patentable. Well, and in fact, what I just described to you was not patentable until we got more specific in the... Well, components of it were, not all the pieces that we put together. It doesn't matter whether it's generally available. They made a contract that they wouldn't use that. Yeah, I think what we got a patent on is the technology that I described and the patent examiner said you need to give a little bit more detail on the internals of the exomer lamp components, specifically the inner electrode, and so we amended the patent application to make clear that the inner electrode was a solid metallic rod. So is it your position that when Judge Hughes says what they have not shown is that the multi-tech exomer lamp was sufficiently similar to Olstowski's exomer lamp not to be his technology, that's not actually a question? That's the wrong question. What is the right... Correct question is, let's take the only three differences that Judge Hughes found, let's take those findings, they are set in stone, we're not changing them. Then the court has to then interpret the patent application as... What is the question? Can you articulate what the correct question is? Sure. The question is whether those three differences take us outside of the four corners of the description of the technology in the patent application, and they don't because... The description of the technology is sulfur using electroviolet... This is on page 3458. Again, it's the system and method for detecting sulfur dioxide, so that's the function. There were other means to do that. What was new was the krypton chloride dielectric barrier discharge exomer lamp, and the reason the patent application allowed... And here's why the patent application is a broad description, and it even encompassed this, and we raised this in a brief, it encompassed this language. The above embodiment of the exomer lamp can take many and numerous forms, and departures can be made from the details without departing from the spirit and scope of the disclosed general inventive concept. All of that's in the language of the patent application, and so long as it has the key components, there can be differences. The differences with the shape of the electrode does not take you out. Now, if they didn't have an electrode at all, then it's not... There's no expert in the case that walks us through this. There are. They all testified... The question is not this, it is this, and so these things are irrelevant, these differences. I don't think this is an expert issue. All the testimony we don't dispute. It's simply a matter of construing how broadly the patent application describes what the technology is. The sort of fundamental core in trade secret cases generally is that generic stuff, physics, isn't suddenly a trade secret. So yes, every trade secret is going to have some basic physics in it. That doesn't suddenly make that the trade secret. So it's what's unique about this document is what makes it the trade secret, not the contained in it. So you're asking us to say as a matter of law, we're supposed to understand that this matters and this doesn't and this is this and this is that. That does sound very expert to me. Even the ones you just cited, I'm looking at it, is fairly complex. It is complicated stuff. I come from a family of scientists. I'm the mutation. So I would want to hear a little more explanation if I'm trying to decide this, and that sure sounds factual to me. And I've cited to the court the documents and the pages from the depositions from the patent applications from both sides that define all of the similarities that make it similar enough to fit within the scope of what we say is the trade secret. It's not. You know what is gasoline and what is the color of the car versus, so what is gasoline and the color of the car versus what is the core of the difference? It's not a scientific question here because we don't dispute the facts. The facts may be difficult to understand, but they don't change the fact that as long as it has those key components, it's our technology and I don't want the court to get sidetracked with the issue of novelty and invention. Our citation to the FMC versus VARCO case distinguishes this is a trade secret case. This is not a patentability case. So novelty and invention are not important. It's simply, did they use ... Your argument in this case is that the general ... I didn't do patent cases as a lawyer, but I did trade secret cases. And you couldn't just show up and say, oh, this is a trade secret that you just read in the newspaper, okay? Your argument on that is it doesn't matter if it was in the newspaper because we've got this law of the case that makes it a trade secret. But I'm saying you still have to have something that's unique because everything is going to have some physics in it in the science world and physics is not a trade secret. Can I answer a question? Okay. Again, uniqueness is not the issue here because it's simply a dispute between two parties. It's undisputed, and this is even in the district court's findings. We disclosed this technology to them. It's not about whether this is a novel idea. It was, but it's not about that. This court doesn't have to decide whether it's new or novel or different or an invention. It simply does the four corners of what is the law of the case describing the technology. Can we fit the pieces that are relevant and that are the key components? Can we fit their technology into that box and putting aside that those three differences don't take it out of that box because they were contemplated and anticipated in the patent application itself that squarely defines the trade secret. So this court, the district court, does not have to decide, oh, this is something new or different. Is it your position that the law of the case says this is a trade secret and we can't look behind and say it's not really a trade secret because it's not unique enough? That's right, Your Honor. That is not what I am saying. Okay. All right. I'm saying that in a document, every word in there isn't suddenly a trade secret. It's what is this thing that, because you're always going to be describing stuff and if you say, well, I also used water, that doesn't suddenly make water a trade secret, okay, that now they're barred from using. So it's just how you used it, in what way you used it. It's not that there was water. That's what I'm trying to say. The whole document is providing the information, but how we figure out whether that was stolen or not means we have to know what in that information was different and then we can compare it. You're just saying we should ignore the differences that the judge found because they don't matter and I'm saying how do we know that? Well, we know, if I can answer that question too. Judge Haynes's question and then you've saved your time for a while, but you may answer the question. Thank you. We know because, first of all, Judge Hynde, in his clarification order, said precisely how he interpreted, the same way we do, what the trade secret was. Very simply, almost verbatim from what I read from the patent application, which is technology using an XMR light source that uses krypton chloride specifically to measure sulfur using ultraviolet fluorescence. If they use different gases in their XMR lamp or they didn't use a dielectric barrier with two diodes and a dielectric barrier where the gas then stays within the envelope, if they didn't use those things, they used a different gas, they didn't have an in electrode and an outer electrode, they didn't have those things, they're not violating the trade secret. Thank you. We'll now hear Petroleum Analyzer. May it please the court. My name is Steve Knight. I'm here on behalf of Petroleum Analyzer Company. As the panel has just heard, there's two primary issues in this appeal. The first is, did the district court properly determine that Olstowski and his company, Adam, failed to establish that Petroleum misappropriated his trade secret with its multi-tech instrument? And second, did the district court properly award Petroleum its attorney's fees for successfully defending the Texas Theft Liability Act claim? The answer to both of these questions is yes, and I'll begin with the first. After unsuccessfully litigating in the state court whether Petroleum should be forced to earlier version, the Antec 9000, as well as an eczema lamp that Petroleum acquired from a company known as Horaeus Noble Light, a German company that's been in existence since the 1800s, Olstowski then comes to federal court advancing additional claims, misappropriation of trade secret and theft. Do you concede that the method that we're talking about uses krypton chloride to detect sulfur in Petroleum? His method uses krypton chloride. No. Does the product, the thing that we're talking about here, does it use krypton? The Horaeus eczema lamp used a combination of krypton chloride. It uses krypton chloride to detect sulfur. Correct. So, you agree that your product does do that? The Horaeus eczema lamp that they developed for the use of the multi-tech used that. Yes, that's correct. No, I'm not asking about their product. I'm asking whether or not your thing also uses that. The multi-tech instrument that uses the eczema lamp prepared by Horaeus Noble Light uses the krypton chloride technology. Correct. So, you concede that you use the krypton chloride? It uses krypton chloride. Correct. Now, Judge Hughes early in this case defined the issue before the court as follows, and that's correct. The issue is whether the eczema lamp of petroleum used the technology described by the arbitration panel in the conclusion of law number five. So, you go to conclusion of law number five. This is what defines his trade secret and his technology. What the arbitration panel said and how they described it is very important. It describes not any eczema lamp that uses krypton chloride. If it was that simple, that's all they would have to say. What they said is the technology and methods embodied in the patent application styled eczema or UV fluorescent detection. It went on to say, with specific reference to the drawings that Olstowski submitted in connection with his patent. And then the third component of what the arbitration panel said is the issued patents or patent applications pending. It is important to compare Olstowski's technology and methods that are embodied in his patent application and the patent in determining— Let me ask you something else before you go on. After those three paragraphs, Judge Hind then said the phrase, his eczema technology is not limited to December 11, 06, but includes technology and methods embodied in any patent applications. Does that add anything to the three categories? It doesn't. And let me tell you why. Because that's what I'm going to get to right now. Judge Hind said that, and what he's basically saying is his technology includes whatever he redefined when the patent examiner said, this is too nonspecific, this is all public, give me more details, which is what he did. So Judge Hind is simply encompassing that. But what I— He's doing something beyond what was in the actual patent application, though. I don't think he is. Let me first talk about, if I may, what—when you look at what Judge—the way Judge Hughes defined this issue, by looking at what the arbitration panel awarded and those three components of what is defined as his trade secret and his technology, again, technology and methods in the application, the drawings and the issued patent or any amended patent that he submitted after it was originally rejected. It is important to compare the technologies and the methods, and that is precisely what Judge Hind did. There was not a lot of help in the trial court from any witness that they presented. But even looking at the original version of the application, of the patent application, Olstowski defined his technology very specifically as encompassing an emission aperture at the remote end of the court's envelope. That was key to his design. He described his method in his patent application as describing how the photons will leave the lamp via the emission aperture. That was critical to his design of his Exmer lamp. I don't think it's the patent application that we look at, though, to decide whether the trade secret has been violated, is it? Yes, it is. Isn't it? What— What Judge Hind said was the trade secret that we look at. When Olstowski filed this lawsuit in federal court, he submitted a filing to Judge Hughes, asking Judge Hughes, make a ruling defining what technology in dispute belongs to plaintiffs. That's what he asked for. That's at record 39. That's their filing. Judge Hughes simply reverted back to what the arbitration panel found. Those three things— Is that the right place to go, or is Judge Hind the right place to go? I think Judge Hughes's order is the right place to go. But what Judge— I'm going to choose to get it from somewhere. But what Judge Hind wrote doesn't change anything, and I'll explain that. But let me— Are you saying that you're Judge Hind? No, I'm— I do think it changes it. Does the arbitration trump, or does Judge Hind trump? I say that the—what the arbitration—I say what Judge Hughes ordered in federal court in the litigation that they chose to file governs. But what I'm saying is, if you also look to what Judge Hind wrote, it doesn't change the analysis. Because contrary to what they argued, Judge Hind did not recognize as any and all eczema technology that uses krypton chloride as defining his trade secret. If it was that simple, that's all the order would say. Judge Hind also wrote the phrase technology developed by Ostowski. He talks about the technology and methods embodied in the patent application styled UV—the UV—eczema UV fluorescence. He says the technology developed by Ostowski is the technology and methods substantially identical. So he's referring back to the arbitration award, too. And this is why this is so important in this case. As I've already mentioned, he described his methodology in the original patent application as embodying this court's envelope, and he described the method of how it works. When he—when the patent was issued, after he submitted the amended application, he described his technology in even greater detail. His technology depends on an emission aperture at the remote end of a court's envelope. He described the methodology of that emission aperture. He says the photons will leave the lamp via the emission aperture. He goes on. His invention is so specific and so technical that it requires or involves additional technology that's unique. It has an internal power supply. The internal power supply is critical to his invention because he also has an inner electrode comprising of a conductive solid metallic rod. Why does that matter? Because when he describes his methodology in the patent application, he says this. The method involves the electrodes working in tandem with the internal power supply. Here's the quote. A charge will begin to build between the electrodes. As the voltage or strength of the applied field continues to increase, a critical point, known as the dielectric breakdown, is reached. So what we know from the patent application and the issued patent is that for Olstowski's version of an Exomer lamp to work, it requires his version of this unique emission aperture. It requires an internal power supply. It requires an inner electrode comprising a conductive solid metallic rod. The multi- Do we need expert testimony on this? Sorry, Judge. Do we need expert? Did Judge Hughes need expert testimony on this? You need expert testimony on this because the critical claim here is that we stole some technology that they want to characterize as his. The factual dispute is the Horaeus Exomer lamp uses technology that is completely unlike the technology that he developed and functions differently. I'm having trouble, like, how is that a question of law? It's not. It's a factual inquiry. And that's the factual inquiry that Judge Hughes was actually able to embark on despite the meager testimony. How did he get to decide, I mean, how could he decide that without testimony to help in that way? Judge, he can decide it based on the testimony that was offered. And let's talk about what testimony was offered. The testimony established that the Horaeus Exomer lamp has a hollow cylindrical inner electrode. It's unlike his. The testimony at trial was that the Exomer lamp, importantly, the Horaeus Exomer lamp lacks any emission aperture at all, which Judge Hughes found based on the evidence and based on the testimony that we offered. And the evidence is inadequate, that falls on point. Absolutely. And here's what's so important, and I think you need to keep this in mind as you're looking at this case. Alstowski has been, ever since the multi-tach instrument came into existence with the other lamp, Alstowski has been litigating this for a decade. He's the scientist that created his version of an Exomer lamp. They had every opportunity after litigating for almost a decade to present their case, perform the analysis, show us how this Exomer lamp functions so similarly to the Horaeus Exomer lamp, that they're literally the same and therefore we stole their technology. Demonstrate it. They don't have to be literally the same, and it doesn't have to be any of that. They have to demonstrate that we misappropriated their technology, their trade secret. It's just the means to use it. They don't have to show that it's exactly the same, none of that is the right test. They at least have to show that it's substantially similar. That's what Judge Hines wrote in his order. He used the language substantially similar. They didn't demonstrate any similarity. They utterly didn't present any evidence at trial, and most importantly, Alstowski himself, during a six-hour trial, which is shorter than the average car accident trial, Alstowski declined to testify. Now, Alstowski presented two witnesses, two witnesses and two witnesses only. Both of them... He doesn't construe that against the plaintiff, the fact that the plaintiff doesn't testify. Well, the district court can, and the district court should, but even more importantly, the district court has every right to examine what testimony did they offer, and what they offered was testimony by two former petroleum witnesses. What did they have to say about this issue? Well, Mr. Gowdy said, the Horaeus Eximer lamp, in his words, is a unique lamp. That's their witness. It's unique. The center is hollow. I mean, there's a number of things about it that make it unique. That's their witness. Alstowski's Eximer lamp has two solid electrodes. He's pointing out the differences, and again, focus on the patent and the patent application and the drawings. All of them highlight these attributes of what make his lamp work. This is his technology, and it's unlike ours. You mentioned Judge Hughes' definition of kind of where do we go from here, his question. Did they object to that question? No, they answered it. They ran their face, and everybody got on with it. Judge, that's why I wanted to highlight that. If we were going to reverse, it wouldn't be on that question. In other words, we wouldn't reverse because of the positing of that question, because everybody agreed with the positing. So that's why, quite frankly, in light of the arguments that we're hearing in the brief and on appeal, when Judge Hughes said, and this is quote, jointly report on what the parties believe need to be done to progress the litigation. Well, they could have said, well, we think that the definition of our technology is already defined. All you need to do is proceed with the trial. Instead, they said, quote, Judge Hughes, we want you, federal district court, we're invoking your jurisdiction to, quote, make a ruling defining what technology and dispute belongs to us. They didn't object to that. They didn't object to it? To the question? Their answer. This is a question of law. You guys are not disputing that your machine used krypton chloride. If that's enough, what do we need a trial for? Right. If that's enough, what do you need a trial for? And also, if that's really the defining characteristic of what they want to say is their trade secret, no order says it that simply. I mean, come on. That's a fiction. What the arbitration panel said, what Hines said, what Judge Hughes said, is you have to look to what the arbitration panel said in that paragraph five. What did they focus on? The arbitration panel focused on technologies and methods. I walked you through all the technologies and methods that are. It's a small part. So one thing that's interesting is that the test that we submitted, which is that record 4090, and this is sort of part and parcel to the idea that whereas they want to claim all uses of Exmer technology very broadly as being their trade secret, and I refer the court to cases like the Mountain State Rosin case, 637 F 3rd 604, where the Fifth Circuit states the unsurprising and very basic proposition that information that's already public knowledge or that's generally known in an industry can't be a trade secret. So I cited the article at 4090 in the record, a 1996 article that uses an Exmer lamp comprising of krypton and chloride that notably says we reached a particular result and we were able to achieve this result not based simply on the use of krypton chloride, but based on the physical attributes of this lamp that we were able to manipulate in various ways to achieve the appropriate nanometer reading that they were trying to find. If anything is already within the logical extreme, then the use of any lamp would be a trade secret because that's in the document, the word lamp. That's right. And this is the part that I'm grappling with, is I don't think that every word in this document is a trade secret. It's how is this all put together and is that putting together substantially similar to y'all's putting it together? And I'm struggling with how you're supposed to figure that out as a layperson judge without some expert help. Well, to me, I agree that the plaintiff would have been and should have presented testimony and evidence to describe the similarities. Again, they not only failed to do that, the witnesses, the two witnesses, both that they presented, supported our position that the technologies are different. In fact, I talked a moment ago about what Mr. Gowdy said. What Mr. Mendez said was even more telling. What he said, again, this is decades long of litigating over our instrument and why he wants to take our profits because he says it's so similar. Mendez says that he performed no comparative analysis of the two Exemer lamps. We asked him at trial, tell Judge Hughes, how did we infringe or misappropriate your trade secret? And he says, quote, I don't have the knowledge to detect those details of the lamp. I'm not an electronic engineer. He also stated, he explained that he cannot discuss physical attributes of the Exemer lamps, quote, unless I perform tests on it. They didn't perform any tests on it. The only person that may be able to explain something about why they're accusing us of using their trade secret by using an Exemer lamp that is completely unlike anything that they developed, the only person that was in the courtroom who could have filled in the blank was Mr. Olstowski. And he not only didn't testify in support of their direct claim, after we presented our defense, primarily through Ms. Houston, who described in great detail that, yeah, we worked with Mr. Olstowski at one point in the past, a long, long time ago. But when we developed our instrument with Horatius' Exemer lamp, it was completely walled off. It was absolutely walled off to even avoid the appearance that we could somehow have access to anything that he had. Mr. Olstowski sat in the courtroom for all of that. They could have called him as a rebuttal witness to explain to Judge Hughes why this is just not so, or why it just doesn't matter, or some similarity in the invention. He chose to stay silent. Do you have anything else, counsel? I guess I will conclude. If you don't have any questions for me, we asked that the court— But what was the testimony claim to be? Why didn't you all segregate the fees? We did segregate the fees. I would refer the court to Ms. Kirchner's affidavit. And she explains in that affidavit the numerous time entries that were segregated out, also segregated out was all the years and years of litigation through the arbitration proceeding, through the state court, you know, all of that. What we asked for was when they filed the—it was the filing of the Texas theft liability claim in 2012 in Judge Hughes' court. That's what started the clock for when we can claim our fees. And even at that, the detailed affidavit goes through the methodology in averaging the rates and all that stuff that you're supposed to do. It's a very detailed affidavit. And this is actually when I first got involved in the case because I handled the hearing on the attorney's fee request. And what's notable to me is that they're making arguments here about segregation and whatnot that they didn't, again, make to Judge Hughes. Most of the time entries are from Shane Nichols, who was the main trial lawyer throughout the federal litigation, Shane Nichols. He was in the courtroom. They could have put him on the stand and said, how does this entry relate? None of that. Absolutely none of that. So, you know, there was segregation. They're claiming there should have been a greater degree of segregation based on what they've said in the brief. Those discussions didn't occur before Judge Hughes. And again, they had the witness there to quiz about this. So they didn't allow Judge Hughes to even consider what they're now claiming on appeal. So, thank you. Judge Haynes, I want to answer your question better than I did before. And it goes to your question about why wasn't there expert testimony, and I'll explain why. You don't need an expert, I'm sure the court would agree, to construe the confirmation award, to construe the words of the patent application, which is what all of us are stuck with, applying to this set of facts. The word lamp doesn't make it. If they have a lamp, that's not a trade secret. I mean, just a word being in the document that the arbitration said is part of the trade secret, that's not enough. Right. And I think what the court, absolutely. Can you explain to me how we know what's what? What is a word that is a word? What is water? What is oxygen? And what is specific to this trade secret that makes it protected versus their thing? Absolutely, I'll do that. So, there's kind of three points I want to make on that. First, the reason we didn't have an expert to go up there and testify about why these things are differences, because we don't dispute the three differences, and that's important. Judge Hughes only found three differences that we say are encompassed within the patent application. They could have raised more differences. If there were any, there aren't. Second, those differences don't matter as a matter of law, we argue, because they were anticipated in the patent application itself, which said that the Exelor lamp can take many and numerous forms. That's all those three differences consist of, is differences in the form of the lamp, either the percentage or the mixture. But it's not only their duty to show the differences. It's your duty to show the similarities. No, we simply, we admit, no, absolutely. What I'm saying is we don't, what I'm saying is we, their own testimony through their depositions and the record citations that I gave, their patent application, their trial testimony all concede, and they're, in their, the list of the similarities in the comparison document, that's 3884, all those documents and that testimony together admits the facts that make that technology what is defined very broadly, but specific in the patent application. So what Judge Hind was doing for all of us, frankly, when he signed that clarification order, we don't think it was really a clarification. We think he construed the patent application, as this Court must do, precisely the way we had all along, which is to say, if the arbitration award and the confirmation order as affirmed by the Court of Appeals say that the patent application is the krypton chloride dielectric barrier discharge Exelor lamp, if that is the technology that was new, and they have that same technology despite those physical differences in the internals of their lamps, then that is what is the trade secret, and if they're using that, the emission aperture is a component, a piece, a structure of the lamp, and it's simply the part of the Exelor lamp where the light comes out of. They call it an output light window in their patent application. That's in pages 3700 to 3701. It's basically, you know, maybe our emission aperture might be smaller than their output light window, but functionally it's the same thing. The light has to come out to be able to excite the sulfur dioxide. So our position is that is a physical difference, as the patent application says. Departures may be made from the details without departing from the spirit or scope of the disclosed general inventive concept, and this is a general inventive concept that became patented, but the more broad patent application didn't narrow that one piece of that, the Exelor lamp, which was the inner electrode shape. Let me ask you, is your position essentially one of the, part of Judge Hines' 2011 order describes all we need to know. Before he got into the three paragraphs pulled out of the arbitrator's decision, he said the technology developed by your client means technology using an exomer light source that uses krypton chloride specifically to measure sulfur using ultraviolet, whatever the last word is. Are you saying that's the be all end all and that's what they have done and so therefore it violates this interpretation which is binding on us? Yes. All right. I think I know where you are. Thank you. Any other questions? Thank you, Your Honor. The court will take a brief recess before considering the rest of the cases for today. Thank you. This case is submitted.